UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                         :

STANLEY A. ARNOLD,

                                         :

                Plaintiff,              09 Civ. 3727 (JSR) (GWG)

                                         :

      -v.-                            <u>REPORT AND RECOMMENDATION</u>

                                         :

WESTCHESTER COUNTY, STANLEY
ARNOLD, RANDY WATKINS, ALFRED      :
LOMBARDO, MICHAEL COSTELLO,
KEITH HOLLOWAY, MIGUEL SERRANO,   :
ROBERT O'DELL, and MERVIN ENDERS,

                                         :

                Defendants.

                                         :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Pro se plaintiff Stanley Arnold brings this action under 42 U.S.C. § 1983 to recover

damages for alleged deprivations of his constitutional rights by prison officials of Westchester

County while he was a pretrial detainee.  Defendants have moved for summary judgment

dismissing Arnold's claims.[1]  For the reasons stated below, this motion should be granted.

---

[1]     See Notice of Motion for Summary Judgment, filed July 27, 2011 (Docket # 50); Local
Civil Rule 56.1 Statement, filed July 27, 2011 (Docket # 51) ("Rule 56.1 Statement");
Memorandum of Law in Support of Defendants' Motion for Summary Judgment Pursuant to
Rule 56 of the Federal Rules of Civil Procedure, filed July 27, 2011 (Docket # 52); Declaration
of Melissa Rotini in Support of Motion for Summary Judgment, filed July 27, 2011 (Docket
# 54) ("Rotini Decl.").  In response to the motion, Arnold submitted a motion to amend his
second amended complaint.  See Notice of Motion, filed Aug. 30, 2011 (Docket # 56) ("Mot. to
Amend Second Am. Compl.").  Arnold swore under penalty of perjury to the factual recitations
contained therein.  See id.  The Court denied Arnold's motion to amend without prejudice and
stated it would treat the proposed amended complaint as a declaration in opposition to the
defendants' summary judgment motion.  See Order, filed Aug. 30, 2011 (Docket # 57).  The
Court also gave Arnold leave to submit additional papers in response to the summary judgment
motion.  See id.  Arnold then submitted an opposition memorandum and supporting affidavit.
See Plaintiff's Response to Defendants Summary Judgment Motion, dated Sept. 16, 2011
(Docket # 60) ("Opp. Mem."); Affidavit in Support of Plaintiff's Response to Summary
Judgment, dated Sept. 17, 2011 (Docket # 59) ("Arnold Aff.").  After defendants filed their reply

I.     FACTS

Arnold has not responded to the defendants' Rule 56.1 Statement.  In this situation, the

Court would normally deem admitted all the facts contained in the Rule 56.1 Statement.  See

S.D.N.Y. Local R. 56.1(c); Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003)

("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1

statement, that fact will be deemed admitted.") (citations omitted).  In light of Arnold's pro se

status, however, we will not deem admitted any statement that is controverted by admissible

evidence.  See generally Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)

("[W]here a pro se plaintiff fails to submit a proper [opposing statement] . . ., the Court retains

some discretion to consider the substance of the plaintiff's arguments, where actually supported

by evidentiary submissions.") (citations omitted).

Thus, except as otherwise noted, the following facts are those asserted by Arnold in

sworn statements or uncontested facts asserted by the defendants.  As discussed in section III

below, there is a videotape of the incident out of which this action arises.  In section III, we

discuss evidence shown on the videotape that contradicts Arnold's account and the effect of any

such contradictions on the disposition of this case.

A.     The Inmate Fight

On April 10, 2007, Arnold was incarcerated in the B-Block of the Westchester County

Jail.  See Affidavit of Anthony Watson, dated Jan. 10, 2011 (annexed as Ex. G to Rotini Decl.)

("Watson Aff.") ¶ 2.  B-Block is not a restricted area, which means that inmates assigned to B-

---

brief, see Reply Memorandum of Law in Further Support of Defendants' Motion for Summary
Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed Oct. 3, 2011
(Docket # 58) ("Reply"), Arnold submitted a surreply to the Court, see Plaintiff's Reply to
Summary Judgment, dated Oct. 15, 2011 (Docket # 61) ("Arnold Surreply").

Block are permitted to move freely among the block's dormitory and recreational areas.  Id. ¶ 5.
On April 10, 2007, Arnold and another inmate, Rasheed Binns, were in the recreational area of
B-Block when Binns and Arnold began to quarrel.  See Deposition Transcript of Stanley Arnold,
dated Oct. 25, 2010 (annexed as Ex. D to Rotini Decl.) ("Arnold Dep. 2") at 34–41.

      Binns then walked into a bathroom corridor adjacent to Arnold's dormitory area.  See
Ceiling Mounted Camera Views Video (annexed to Ex. Q of Rotini Decl.) ("Video 1") at
Camera 8, 18:15:00.02–18:15:38.41; Rule 56.1 Statement ¶ 11.  Arnold left the recreational area
shortly thereafter and entered his dormitory area.  See Video 1 at Camera 8, 18:15:02.99; Rule
56.1 Statement ¶ 12.  Arnold sat for about 20 seconds, stood up, removed his shirt, walked
approximately 15 to 20 feet towards Binns, who was standing motionless, and punched Binns
forcefully.  See Video 1 at Camera 8, 18:15:11.83–18:15:39.52; Rule 56.1 Statement ¶¶ 13–14;
Arnold Surreply at 3 (acknowledging that the individuals fighting in the video were Arnold and
Binns and that Arnold initiated the fight).

      Binns backed into the bathroom area, while Arnold stood in the corridor between the
recreational room and the dormitory area, speaking and motioning at Binns to exit the bathroom
area.  See Video 1 at Camera 8, 18:15:39.52–18:16:01.02; Rule 56.1 Statement ¶¶ 15–16.  Binns
exited the bathroom area and struck Arnold.  See Video 1 at Camera 8,
18:15:51.66–18:16:01.38.  Arnold and Binns then skirmished intermittently for approximately
one minute.  Id. at 18:16:01.38–18:16:54.68.  During the course of their fight, Binns struck
Arnold with a "shiny object," which cut Arnold's ear to the extent that Arnold eventually
required 23 stitches.  Arnold Dep. 2 at 44, 107.

    B.      <u>Officer Watson's Actions</u>

      Arnold alleges that defendant Correction Officer Anthony Watson "watched and then

3

waved the fight on," Attachment to Second Amended Complaint, filed July 12, 2010 (Docket # 28) ("Compl. Attach.") at 1 ¶ 1, and "[a]llow[ed] Rasheed Binns to attack [Arnold] with a weapon in plain view. . . . [l]ooking at [Arnold] waving to continue for his own entertainment," id. at 4 ¶ 7; see also Second Amended Complaint ¶ II.D ("C.O. Watson allowed Rasheed Binns to enter unauthorized bed area with weapon and attack me."). Arnold maintains that Binns's presence near his dormitory area was unauthorized. See Compl. Attach. at 4 ¶ 7, 12 ¶ 1; Second Amended Complaint ¶ II.D. It is undisputed that at some point Watson called a Code Signal 1, which summoned the Emergency Response Team ("ERT") and indicated that an inmate fight had broken out. See Watson Aff. ¶ 6; Rule 56.1 Statement ¶ 25.

C.    The ERT's Actions

Arnold alleges that the ERT used excessive force when they subdued and transported him following the fight. In particular, Arnold alleges that an ERT member ordered Arnold onto the ground, Compl. Attach. at 1 ¶ 1, "kneel[ed]" on Arnold's lower back, Arnold Aff. at 1, and "appl[ied] unnecessary pressure to inflict pain and suffering furthermore injuring plaintiff," Compl. Attach. at 7 ¶ 13. The ERT then placed handcuffs and leg restraints on Arnold and escorted him to the G-Block section of the facility. See Affidavit of Randy Watkins, dated Jan. 3, 2011 (annexed as Ex. I to Rotini Decl.) ("Watkins Aff.") ¶ 3; Compl. Attach. at 7 ¶ 13. While transporting Arnold to the G-Block, the ERT instructed Arnold to run, which Arnold attempted to do, but he fell to the ground instead because his leg restraints prevented him from running. See Compl. Attach. at 7 ¶ 13. After Arnold fell, the ERT officers lifted Arnold off the ground by his arms, which were handcuffed behind his back, and allegedly suspended him in the air. See Compl. Attach. at 2 ¶ 3, 7 ¶ 13. During his transportation to G-Block, the ERT also allegedly "poked plaintiff in the ribs from behind with an electric shock gun," id. at 2 ¶ 3; accord id. at 7 ¶

13; "dragg[ed] Plaintiff around like a rag doll on the hallway floors," id. at 9 ¶ 17; see also

Arnold Surreply at 4 ("[T]he officer . . . pull[s] me all over the floor for no reason at all.");

"squeez[ed]" and "smash[ed] the plaintiff's fingers," Opp. Mem. at 4, 9; caused numbness in

plaintiff's hands by "pulling the plaintiff . . . down the hallway with his hands cuffed behind his

back," Arnold Aff. at 3; "continuously pulled the handcuffs up over the plaintiff's head inflicting

. . . . such pain that the plaintiff is jumping up in the air in pain and agony," id. at 2; "forc[ed] the

plaintiff to bend over face first to the ground in pain," id.; "push[ed] the plaintiff over onto the

ground," id.; "twist[ed] [Arnold's] wrist into wrist locks," Arnold Surreply at 5; see also Opp.

Mem. at 10 ("repeatedly using bent wrist locks"); and "twisted" and "pull[ed] . . . the plaintiffs

handcuffs," Arnold Aff. at 2.  The ERT officers also "at no time give the plaintiff the

opportunity to walk simply holding the plaintiffs arms by the side," but instead "stick their arms

up between the plaintiffs' arms" and "lift[] the plaintiff off of the floor" as they proceeded down

the hallway such that "the plaintiff cannot place his feet on the ground to walk," but rather "is

simply dangling from the arms of the officers with his tiptoes bouncing off of the ground."  Id. at

3.

Arnold also contends that the ERT "delayed immediate medical care" to his injured ear

"by not taking plaintiff straight to medical assistance but instead to [the G-Block]," where ERT

conducted a strip search of Arnold.  Compl. Attach. at 10 ¶ 19.  During this episode, Arnold "at

no time . . . show[ed] any signs of resistance [and] . . . always complied [with] the officers."

Arnold Aff. at 3.

When the ERT brought Arnold to the G-Block to strip search him, the ERT allegedly

ordered Arnold to remove his clothes, lay down on a concrete bed, and "reach back and open up

[his] asshole."  Compl. Attach. at 2 ¶ 4; accord Arnold Aff. at 8; Compl. Attach. at  8 ¶ 14, 9

5

¶ 16.  To that instruction, Arnold responded, "Do what?"  Compl. Attach. at 2 ¶ 4, 8 ¶ 14, 9 ¶ 16.

The ERT then "rushed" Arnold to the Westchester Medical Center, where he received medical attention, including reconstructive surgery to his injured ear.  Deposition Transcript of Stanley Arnold, dated Sept. 26, 2007 (annexed as Ex. C to Rotini Decl.) ("Arnold Dep. 1") at 30.

II.     LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (additional citation omitted) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to

make a showing sufficient to establish the existence of an element essential to [its] case."

Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (internal

quotation marks omitted) (alteration in original).  Thus, "[a] defendant moving for summary

judgment must prevail if the plaintiff fails to come forward with enough evidence to create a

genuine factual issue to be tried with respect to an element essential to its case."  Allen v.

Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247–48).  The same

rules apply to a pro se litigant.  See, e.g., Bennett v. James, 737 F. Supp. 2d 219, 226 (S.D.N.Y.

2010) ("Notwithstanding the deference to which a pro se litigant is entitled, as well as the

deference accorded to a non-movant on a summary judgment motion, [the non-movant] must

produce specific facts to rebut the movant's showing and to establish that there are material

issues of fact requiring a trial.") (internal quotation marks and citations omitted).

III.   DISCUSSION

         To state a claim under § 1983, Arnold must show that he was denied a constitutional or

federal statutory right and that the deprivation of that right occurred under color of state law.

See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).  Section 1983 does not grant any

substantive rights but rather "provides only a procedure for redress for the deprivation of rights

established elsewhere," such as in the Constitution or federal statutes.  Sykes v. James, 13 F.3d

515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240 (1994).  Here, Arnold

claims that Officer Watson and the ERT violated his due process rights by acting with deliberate

indifference towards his safety, using excessive force in subduing and transporting him, and

conducting an illegal strip search of him.  A court considers such claims made by a pretrial

detainee under the same standards that govern a claim, under the Eighth Amendment, to be free

from cruel and unusual punishment.  See United States v. Walsh, 194 F.3d 37, 47–48 (2d Cir.

1992); accord Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); Ross v. Westchester Cnty. Jail, 2012 WL 86467, at *5 (S.D.N.Y. Jan. 11, 2012) (applying Eighth Amendment standards to pretrial detainee's claim of deliberate indifference to his serious medical condition); Jones v. Diaz, 2011 WL 1202024, at *3–4 (S.D.N.Y. Mar. 23, 2011) (evaluating pretrial detainee's illegal strip search and excessive force claims under Eighth Amendment principles).

    A.    Excessive Force Claims

    While the use of excessive force is prohibited by the Eighth Amendment, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'"  Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).  To establish a person's liability under the Eighth Amendment for excessive force, a plaintiff's claim must satisfy both an objective and subjective element.  See Hudson, 503 U.S. at 7–8; accord Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009); Walsh, 194 F.3d at 49–50; Pearson v. Cantor, 2010 WL 3420532, at *3 (E.D.N.Y. Aug. 26, 2010).  Thus, courts "must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation."  Hudson, 503 U.S. at 8 (citations omitted) (alteration in original).  "Where a plaintiff fails to satisfy either of these prongs, the defendant is entitled to summary judgment."  Johnson v. City of New York, 2011 WL 1044852, at *4 (S.D.N.Y. Mar. 18, 2011) (citing Cunningham v. Rodriguez, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002)).

    The objective prong "focuses on the harm done, in light of contemporary standards of

decency." Wright, 554 F.3d at 269 (citations and internal quotation marks omitted).  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Wilkins, 130 S. Ct. at 1178 (citations and internal quotation marks omitted).  A complaint "of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." Id. (citations and internal quotation marks omitted).  A prison official's malicious or sadistic use of force, however, always violates contemporary standards of decency.  Wright, 554 F.3d at 268–69 (citing Hudson, 503 U.S. at 9).  "This is true whether or not significant injury is evident." Id. (quoting Hudson, 503 U.S. at 9).  While not dispositive, the extent of a plaintiff's injury is "relevant to a determination of whether force was 'sufficiently serious by objective standards.'" Ninortey v. Shova, 2008 WL 4067107, at *10 (S.D.N.Y. Sept. 2, 2008) (quoting Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999)) (additional citation omitted).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." Wright, 554 F.3d at 268 (citations and internal quotation marks omitted).  The crucial question in this respect is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 130 S. Ct. at 1178 (citation and internal quotation marks omitted); accord Wright, 554 F.3d at 268; Pearson, 2010 WL 3420532, at *3.  In assessing the subjective prong, courts focus on the following factors: "(1) the need for the application of force, (2) the threat reasonably perceived by the responsible officials, (3) the relationship between the need and the amount of

force used, and (4) any efforts made to temper the severity of a forceful response."  Sidney v.

Wilson, 2007 WL 4208626, at *4 (S.D.N.Y. Nov. 21, 2007) (citations omitted).  "The extent of

injury suffered by an inmate is one factor that may suggest whether the use of force could

plausibly have been thought necessary in a particular situation."  Wilkins, 130 S. Ct. at 1178

(quoting Hudson, 503 U.S. at 7) (brackets and internal quotation marks omitted).

   Arnold cites various acts committed by the ERT during the process of subduing and

transporting him and alleges that they constituted an excessive use of force.  Specifically,

members of the ERT allegedly (1) kneeled on Arnold's lower back, see Compl. Attach. at 1 ¶ 2;

Affirmation in Support of Motion, dated Aug. 10, 2010 (annexed to Mot. to Amend Second Am.

Compl.) ("Arnold Decl.") ¶ 2; (2) suspended Arnold in mid-air by his hands, which had been

handcuffed behind his back, see Compl. Attach. at 7 ¶ 13; (3) forced Arnold to run down a

hallway while he wore leg restraints, which caused him to fall, see id.; (4) "prob[ed]" Arnold in

his ribcage with an "electric shock gun," id.; (5) "smash[ed] and twist[ed]" Arnold's fingers,

Arnold Decl. ¶ 2; (6) handcuffed Arnold in a manner that caused him pain and numbness, see

Arnold Aff. at 3; Opp. Mem. at 10; and (7) forced Arnold to walk down the hallway hunched

forward while ERT officials lifted upwardly on the undersides of his arms, see Arnold Aff. at 3.

   Before discussing these claims, we note that Arnold's characterizations of these incidents

are in some instances at odds with videotape evidence that has been submitted on this motion,

the authenticity of which is not disputed.  In instances where the videotape clearly contradicts

Arnold's version of events, we have disregarded Arnold's version on the ground that a

reasonable juror could not credit Arnold's version in the face of the videotape evidence.  See

Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that the lower courts erred in adopting the

plaintiff's version of the facts when considering the defendant's motion for summary judgment

because videotape evidence directly contradicted the plaintiff's testimony); accord Cameron v. City of New York, 598 F.3d 50, 60 (2d Cir. 2010) ("When a movant presents '[i]ncontrovertible evidence . . . such as a relevant videotape whose accuracy is unchallenged,' we will grant the movant's motion for [summary] judgment . . . if that evidence 'so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.'") (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)); Pietrangelo v. Alvas Corp., 2010 WL 5156385, at *5 (D. Vt. Dec. 14, 2010) ("When rendering judgment as a matter of law, a court may credit video footage over a party's recollection of events."); Glassberg v. Staples the Office Superstore East, Inc., 2010 WL 3924682, at *4 (E.D.N.Y. Sept. 13, 2010) (in ruling on a summary judgment motion, the court "is compelled to credit [surveillance footage] over the plaintiff's recollection") (citing cases).

      1.    <u>Kneeling on Back</u>

     The videotape shows that when the ERT officers arrived to subdue Arnold, one ERT official momentarily and without significant force placed his knee on Arnold's back as the other ERT officers approached to handcuff Arnold. Specifically, the video shows that the ERT officer slowly lowered his right knee onto the lower-left side of Arnold's back and rested his weight on his left leg, which did not contact Arnold. See Video 1 at Camera 13, 18:18:58.89–18:19:00.88. The ERT official's right knee had contact with Arnold's back for less than one second. See id. at 18:18:59.70–18:19:00.60. Arnold did not physically react to the contact. See id. The official removed his knee from Arnold's back once another ERT officer arrived and stood above Arnold with his legs astride Arnold's torso. See id. at 18:19:00.60–18:19:01.70. Far from constituting "excessive" force, the ERT officer's minimal contact with Arnold's lower back was perhaps the least amount of force an officer could be expected to employ to restrain Arnold in order to

handcuff him.  The officer's contact with Arnold's back clearly amounted to "a good-faith effort

to maintain . . . discipline."  Wilkins, 130 S. Ct. at 1178.  No reasonable jury viewing the

videotape could conclude otherwise.

        2.      Suspension by Hands

The videotape likewise contradicts Arnold's assertion that the ERT officers "suspended

[Arnold] in the air" by his hands, which were handcuffed behind his back, when they lifted

Arnold to his feet after he had fallen.  Compl. Attach. at 7 ¶ 13; see also Arnold Decl. ¶ 2.  While

the ERT officers were escorting Arnold down a hallway, Arnold fell to the ground.  See ERT

Response Video (annexed to Ex. Q of Rotini Decl.) ("Video 2") at 3:02.  As Arnold stood up

from the ground, the officers held Arnold by his arms to raise him from the ground.  Id. at

3:04–3:06.  The video shows the officers using minimal force in lifting Arnold to his feet.  See

id.  Indeed, Arnold stood up primarily on his own, with the officers merely stabilizing him while

he did so.  See id.  Arnold argues that "[t]he officers lifting the plaintiff off the floor not allowing

the plaintiff to simply walk down the hallway . . . is a[n] unnecessary use of force to inflict pain

upon the plaintiff."  Arnold Surreply at 5.  But the mere lifting of Arnold off the floor to his feet

does not by itself constitute excessive force, and contrary to Arnold's assertions that he was

"suspended" in the air, the video shows that Arnold's feet never left the ground during this

episode.  See Video 2 at 3:02–3:08.  Moreover, Arnold does not allege that the officers' lifting of

him caused him any injury.

        3.      Forced Fall

Arnold asserts that the ERT officers forced him to run down the hallway with leg

restraints on his feet, which caused him to fall.  See Compl. Attach. at 7 ¶ 13.  The videotape

does not reflect that Arnold was running when he fell.  See Video 2 at 3:01–3:02.  Indeed, the

pace at which the officers and the inmates proceeded down the hallway is best characterized as a

walk at a moderate to brisk speed.  See Video 2 at 0:00–4:28; see also Arnold Aff. at 2 ("[T]he

officers yelled at the plaintiff WALK! WALK!").  While the leg restraints Arnold was required

to wear made walking more difficult, placing leg restraints on Arnold furthered the prison

officials' legitimate interest in safely transporting a prisoner who had just engaged in a serious

fight, and the legality of doing so is not challenged here in any event.  Falling to the ground may

have caused Arnold some pain and discomfort, but such allegations do not reflect harm at a level

that would amount to an Eighth Amendment violation.

Arnold also alleges that the ERT officers "push[ed] the plaintiff, caus[ing] the plaintiff to

fall over."  Opp. Mem. at 5.  But in the one instance on the videotapes in which Arnold falls to

the ground, there is no evidence of any such push, and Arnold actually tells the officers that the

restraints on his ankles caused him to fall.  See Video 2 at 3:08–3:13.  In any event, Arnold does

not allege that he sustained any injuries from his alleged second fall to the ground.  Even if the

officers made contact with Arnold, a push in these circumstances that results in no injury does

not amount to a use of excessive force.  See generally Wilkins, 130 S. Ct. at 1178 ("[A] push or

shove that causes no discernible injury almost certainly fails to state a valid excessive force

claim.").

### 4.   Electric Shock Gun

Arnold's claim that ERT "prob[ed]" Arnold with an "electric shock gun," see Compl.

Attach. at 7 ¶ 13, is not supported by the videotapes.  The videotapes do not demonstrate any

such incident, and Arnold does not argue that the videotapes fail to capture the part of the

episode where he was allegedly prodded with the electric shock gun.  Furthermore, even if

Arnold had been prodded as he maintains, this allegation does not support a claim of excessive

13

force, because Arnold concedes that the ERT did not electrically "shock" him with the instrument.  See Arnold Dep. 2 at 71 ("They -- they were not shocking me.").  Rather, they merely prodded him with the instrument as if it were any other firm object.  See id. ("They were poking me and probing me with an electric shock instrument.").  In Arnold's affidavit in opposition to the summary judgment motion, Arnold does not even allege that he was poked with the electric shock instrument.  Arnold only asserts therein that an officer was "holding" an electric shock gun while escorting Arnold.  See Arnold Aff. at 2.  Arnold does not provide evidence that he suffered any injuries from the poking, and a plaintiff's assertion that he had to briefly endure unwanted pokes do not establish an Eighth Amendment violation.  See Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) ("[Plaintiff's] allegations of excessive force – that he was bumped, grabbed, elbowed, and pushed by [prison officers] – do not approach an Eighth Amendment claim.  The force [plaintiff] describes is not sufficiently serious or harmful to reach constitutional dimensions.") (citing Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

> 5.    Harm to Fingers

Arnold alleges that an ERT officer "squeez[ed]," "smash[ed] and twist[ed] the plaintiffs' fingers" at different times.  Opp. Mem. at 4, 9; accord Arnold Aff. at 2 ("The defendants continue to inflict pain twisting and pulling the plaintiffs' fingers . . . .").  Although these allegations were not contained in his Second Amended Complaint, Arnold asserts them in his later papers because Arnold "now has the video evidence and can explain by watching the video what the defendants were doing to the plaintiff."  Arnold Decl. ¶ 2.  Contrary to Arnold's suggestion, however, the videos do not show any twisting, pulling, smashing, or squeezing of any of Arnold's fingers.  Arnold does not point to the specific portion of the video in which this occurred, nor does he describe with any specificity when it occurred or the circumstances in

14

which it occurred.

Arnold's affidavit testimony that the ERT officers inflicted pain on his fingers must in any event be disregarded because he was specifically asked in his deposition whether he had sustained injuries other than to his lower back, underarms, and wrists, and he responded unequivocally that he had not.  See Arnold Dep. 1 at 38.  As the Second Circuit has held, "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  Mack v. United States, 814 F.2d 120, 124 (2d Cir.1987); accord Estate of Hamilton v. City of New York, 627 F.3d 50, 54 (2d Cir. 2010).

6.    Injuries from Handcuffs

Arnold states that an ERT officer "twisted the plaintiff's hand cuffs . . . for no apparent reason other than to . . . inflict pain," Arnold Aff. at 2, and "pull[ed] the plaintiff all the way down the hallway with his hands cuffed behind his back . . . as the plaintiff's hands are going completely numb," Arnold Aff. at 3.[2]  These allegations fail to sustain a claim that the officers violated Arnold's Eighth Amendment rights.  Once again, Arnold provides no context for the circumstances in which this allegedly occurred.  He provides no time period for the tight handcuffing, and the videotape indicates that it would have been for a period of no more than a few minutes.  Most importantly, he provides no evidence that he suffered any injury beyond temporary pain and numbness.  As one case has noted, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort."  Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d

---

[2]    Arnold makes similar allegations when he alleges that the officers "twisted" his hands into wristlocks.  See Arnold Surreply at 5; Opp. Mem. at 10.

459, 468 (S.D.N.Y. 2008) (citing cases); <u>accord</u> <u>Wang v. Vahldieck</u>, 2012 WL 92423, at *7

(E.D.N.Y. Jan. 9, 2012) (dismissing excessive force claim of a plaintiff who was "shrieking in

pain" from tight handcuffs but where there was "no evidence that the tight handcuffing caused

any actual physical injury"); <u>see</u> <u>also</u> <u>Schy v. Vermont</u>, 2 F. App'x 101, 101–02 (2d Cir. 2001)

(painful handcuffing for two-hour period does not violate Constitution); <u>Davis v. Fischer</u>, 2012

WL 177400 (W.D.N.Y. Jan. 20, 2012) (dismissing excessive force claim that tight handcuffing

caused numbness to the plaintiff's hands); <u>Bender v. City of New York</u>, 2011 WL 4344203, at

*6 (S.D.N.Y. Sept. 14, 2011) ("extremely tight" handcuffing for almost fourteen hours that left

indentations in the plaintiff's forearms for more than six hours after removal is not excessive

force); <u>Cunningham v. McCluskey</u>, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (tight

handcuffing not excessive force where the plaintiff suffered no injury and never notified the

defendant of his discomfort); <u>Barratt v. Joie</u>, 2002 WL 335014 (S.D.N.Y. Mar. 4, 2002)

(dismissing the plaintiff's excessive force claims that included allegations of numbness and

bruising to his wrists from tight handcuffs).  Given the absence of injury, the fact that the

handcuffing took place following a fight in prison where officers were trying to restore order,

and the fact that the handcuffing was for a relatively brief period, the handcuffing Arnold

endured does not sustain a claim for excessive force.

> 7.   <u>Walk Down Hallway</u>

After the officers helped Arnold to his feet after he fell, <u>see</u> Video 2 at 3:03–3:07, Arnold

spoke to the officers escorting him, referred to the "chains on my ankles," and explained to them,

"That's why I fell," <u>id.</u> at 3:08–3:13.  In response, one officer on each side of Arnold gently

16

inserted an arm between Arnold's shoulder and upper arm to hold him up as he walked.[3]  Id. at 3:13.

The officers then continued in this same position and walked Arnold down the hallway, with Arnold's hands remaining cuffed behind his back.  See Video 2 at 3:14–4:30.  At some point Arnold lowers his head and one of the officers says, "Get up.  I'm not going to carry you." Id. at 3:35–3:38.  Arnold says he cannot walk "with these chains around my feet."  Id. at 3:48–3:50.  The group continued walking for approximately another 45 seconds.

Arnold alleges that during this episode the officers "continuously pulled the handcuffs up over the plaintiff's head," Arnold Aff. at 2, and "lift[ed] the plaintiff off of the ground" in a manner that caused the plaintiff to "simply dangl[e] from the arms of the officers with his tiptoes bouncing off of the ground unable to reach the floor to walk," Arnold Aff. at 3.  Because Arnold was hunched forward and the officers were pulling upward on Arnold's upper arms to support him as they escorted him down the hall, Arnold's hands were at times at a level slightly above his head.  However, in these instances, his hands were at the elevation of where his middle torso would be if he had been standing fully upright.  Additionally, Arnold's characterization that he was "dangling from the arms of the officers" is contradicted by the video.  While at times he walked with only the balls of his feet touching the ground, he was never suspended in the air as he asserts.

As was true for the tight handcuffing, there is no evidence at all of any injury from the

---

[3]  It also appears from the video that Arnold says to the officers, "Thank you.  Thank you," see Video 2 at 3:16, after they provided him with this support.  Arnold does not directly dispute the County's assertion, see Reply at 8, that he said these words, although he does contend – without explanation – that "[t]he defendants statements of the plaintiff thanking the defendants for using this use of force against the plaintiff is insulting to any persons intelligence."  Arnold Surreply at 10.

walk other than Arnold's claims of temporary pain or discomfort.  Moreover, it was entirely

reasonable for the officers to escort him in this manner in light of the fact that Arnold was not

able to walk properly, purportedly due to the leg restraints.  The officers never allowed Arnold's

body to be positioned in a manner that would cause more than de minimis pain to an ordinary

person, and any discomfort Arnold claims to have suffered was incidental to the officers'

reasonably executed transportation of Arnold.  The entire walk lasted less than a minute and a

half.  No rational jury viewing this videotape could conclude that the officers' conduct was

either objectively or subjectively unreasonable.[4]

      B.      Strip Search Claim

      Claims of sexual abuse are cognizable under § 1983.  See Boddie, 105 F.3d at 860–61.

Strip searches of inmates, however, are constitutionally valid if they are reasonably related to a

"legitimate penological interest."  See, e.g., Covino v. Patrissi, 967 F.2d 73, 78–79 (2d Cir.

1992) (citing cases); accord Brown v. Graham, 2010 WL 6428251, at *13 (N.D.N.Y. Mar. 30,

2010); Miller v. Bailey, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008).  Prison officials

need not possess probable cause to conduct a strip search of inmates.  Jean-Laurent v.

Wilkerson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006).  In assessing the reasonableness of a strip

search, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is

conducted, the justification for initiating it, and the place in which it is conducted."  Hodges v.

---

[4]  Arnold also asserts that the ERT officers "dragg[ed] [him] around like a rag doll on the
hallway floors."  See Compl. Attach. at 9 ¶ 17; see also Arnold Surreply at 5 (alleging that he
was pulled along the floors with "the weight of plaintiff's body pulling into the plaintiff's
handcuffs").  In the only two instances captured in the video in which Arnold was not standing –
when he was first subdued and when he later fell – the officers helped Arnold to his feet so that
he could walk on his own.  The video evidence thus refutes Arnold's allegation that he was
dragged around the hallway as he lay on the floor.  In any event, Arnold provides no evidence of
any injury from the alleged dragging.

Stanley, 712 F.2d 34, 35 (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)).

After subduing Arnold, the ERT transported Arnold to the G-Block to strip search him. Rule 56.1 Statement ¶ 32.  During the strip search the ERT ordered Arnold to remove his clothes and "reach back and open up his asshole."  See Compl. Attach. at 2 ¶ 4; accord id. at 8 ¶ 14, 9 ¶ 16.  Arnold responded, "Do what?"  Id. at 2 ¶ 4.  At that point the officers present laughed. Arnold Dep. 2 at 76, 80.

This evidence does not reflect the conduct of an unreasonable strip search because prison officials have an obligation to take reasonable measures to protect the safety of the prison's inmates.  See Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994)).  After a fight between two inmates in which one inmate suffers injuries that were likely caused by a weapon, it is plainly proper for prison officials to search both inmates for such weapons or other contraband.  See, e.g., Jean-Laurent, 438 F. Supp. 2d at 323 (concluding that a single strip search of inmates following a stabbing incident failed to state a § 1983 claim).

Nor did the officer's instruction to Arnold to open his anus for a cavity inspection violate the Eighth Amendment.  Notably, Arnold does not provide evidence that any of the officers had physical contact with him during the strip search.  Courts have routinely upheld body cavity inspection of inmates.  See Bell, 441 U.S. at 560–63 (upholding suspicionless visual body-cavity searches of inmates following contact visits); Covino, 967 F.2d at 76–80 (upholding routine random strip searches, including visual body-cavity inspections, performed on prison inmates.). Not every embarrassment, humiliation, or psychological discomfort amounts to a constitutional violation.  Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir. 2003).  Indeed, searches of inmates performed under circumstances causing far greater humiliation have been upheld in this circuit.

19

See, e.g., Morrison v. Cortright, 397 F. Supp. 2d 424, 424–25 (W.D.N.Y. 2005) (no Eighth

Amendment violation where prison official shone light up inmate's anus, ran finger between

inmate's buttocks causing inmate to urinate on himself, and pressed genitals against inmate's

buttocks during strip search); Montero v. Crusie, 153 F. Supp. 2d 368, 375 (S.D.N.Y. 2001) (no

Eighth Amendment violation where, on several occasions, prison official squeezed inmate's

genitalia while performing strip searches).  Here, no rational jury could conclude that the prison

officials' search of Arnold violated Eighth Amendment.

      C.     Claims of Deliberate Indifference of ERT Officials

     An Eighth Amendment claim arising out of allegedly inadequate medical care requires

the prisoner to demonstrate "deliberate indifference to [a prisoner's] serious medical needs."

Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Estelle v. Gamble, 429 U.S. 97, 104

(1976)).  As is true for excessive force claims, claims of deliberate indifference to medical needs

require proof of both a subjective and objective component.  Id. (citation omitted).  The Second

Circuit has explained:

> Subjectively, the official charged with deliberate indifference must act with a
> "sufficiently culpable state of mind." See Wilson v. Seiter, 501 U.S. 294, 298,
> 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). That is, the official must "know[ ] of
> and disregard[ ] an excessive risk to inmate health or safety; the official must both
> be aware of facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the inference." Farmer v. Brennan,
> 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The objective
> component requires that "the alleged deprivation must be sufficiently serious, in
> the sense that a condition of urgency, one that may produce death, degeneration,
> or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)
> (internal quotation marks omitted).

Hill, 657 F.3d at 122.  To establish that a prison official was deliberately indifferent toward an

inmate's health, a plaintiff must demonstrate (1) that the plaintiff "had a serious medical

condition" and (2) that the officer acted recklessly with respect to that condition.  Caiozzo v.

Koreman, 581 F.3d 63, 72 (2d Cir. 2009).  Therefore, "not . . . every injury suffered by one

prisoner at the hands of another . . . translates into constitutional liability for prison officials

responsible for the victim's safety."  Farmer, 511 U.S. at 834.  "Disagreements over

medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of

their intervention implicate medical judgments and not the Eighth Amendment."  Jordan v.

Fischer,  773 F. Supp. 2d 255, 276 (N.D.N.Y. 2011) (citation omitted).

> The Second Circuit has noted that:

> "[d]eliberate indifference" describes a mental state more blameworthy than
> negligence; but a plaintiff is not required to show that the defendant acted for the
> "very purpose of causing harm or with knowledge that harm will result." Farmer
> v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citing
> Estelle, 429 U.S. at 104, 97 S. Ct. 285). Deliberate indifference is "a state of mind
> that is the equivalent of criminal recklessness." Hathaway v. Coughlin
> ("Hathaway II"), 99 F.3d 550, 553 (2d Cir. 1996). A showing of medical
> malpractice is therefore insufficient to support an Eighth Amendment claim
> unless "the malpractice involves culpable recklessness, i.e., an act or a failure to
> act by the prison doctor that evinces 'a conscious disregard of a substantial risk of
> serious harm.'" Chance, 143 F.3d at 703 (quoting Hathaway II, 99 F.3d at 553).

Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 125 S. Ct. 971 (2005).

Arnold complains that the ERT officials acted with deliberate indifference toward his

safety when they "delayed immediate medical care by not taking plaintiff straight to medical

assistance but instead to the [G-Block]," where the ERT officials performed the strip search.

Compl. Attach. at 10 ¶ 19.

When the basis for an inmate's claim of deliberate indifference is a delay in the provision

of medical treatment, the relevant concern is the "particular risk of harm faced by a prisoner due

to the challenged deprivation of care, rather than the severity of the prisoner's underlying

medical condition."  Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).  "[A]n intentional

delay in necessary medical care, amounting in effect to a form of punishment, is actionable."

Thomas v. Tisch, 2009 WL 701009, at *8 (E.D.N.Y., Mar. 11, 2009) (internal quotation marks and citation omitted).  But in the absence of a showing of the subjective and objective prongs of a deliberate indifference claim, a delay in medical treatment by itself cannot violate the Eighth Amendment.  Thus, in numerous cases, courts have found that delays in the medical treatment of prisoners have not met the deliberate indifference standard.  See, e.g., Cain v. Jackson, 2007 WL 2193997, at *6 (S.D.N.Y. July 27, 2007) (four-hour delay in requested medical treatment); Palacio v. Ocasio, 2006 WL 2372250, at *2, *11 (S.D.N.Y. Aug. 11, 2006) (two-hour delay in treatment where plaintiff's jaw was broken and blood was "streaming from [plaintiff's] gums"); Davidson v. Harris, 960 F. Supp. 644, 648–49 (W.D.N.Y. 1997) (six- to eight-hour delay after receiving non-life-threatening stab wounds); Linden v. Westchester County, 1995 WL 686742, at *3–4 (S.D.N.Y. Nov. 20, 1995) (eight-hour delay in treatment after plaintiff was beaten).

Here, when the ERT officers arrived, Arnold had already sustained lacerations to his right ear that ultimately required 23 stitches and reconstructive surgery to repair.  See Arnold Dep. 2 at 44.  They brought him to a separate area to search him for contraband and then "rushed" him to the hospital.  Arnold Dep. 1 at 30.  Arnold's deliberate indifference claim against the ERT officials fails both because Arnold does not provide evidence showing that the delay – the precise duration of which Arnold never specifies – caused any additional injury and also because it was objectively reasonable under the circumstances for the prison officials to verify, before bringing Arnold to the hospital, that Arnold did not possess any weapons or other contraband that could pose a danger to his or the ERT officers' safety.

     D.     Deliberate Indifference of Officer Watson

 "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."  Hayes, 84 F.3d at 620 (citing Farmer, 511 U.S.

at 847).  As a corollary, the Eighth Amendment prohibits a prison official from acting with

"deliberate indifference towards the safety of the inmate."  Id. (citing Morales v. N.Y. State

Dep't of Corrs., 842 F.2d 27, 30 (2d Cir. 1988)).  Rather, prison officials have an obligation to

"provide reasonable safety for inmates. . . . [and] to respond appropriately once they are aware of

a substantial risk of serious harm" to an inmate.  Muhmmaud v. Murphy, 2009 WL 4041404, at

*9 (D. Conn. Nov. 19, 2009).  A plaintiff alleging that a prison official was deliberately

indifferent to the plaintiff's safety must first demonstrate that, objectively, he was "incarcerated

under conditions posing a substantial risk of serious harm" to him.  Hayes, 84 F.3d at 620.

Second, the plaintiff must show that the officer possessed "sufficient culpable intent," which

exists if the officer "has knowledge that an inmate faces a substantial risk of serious harm and he

disregards that risk by failing to take reasonable measures to abate the harm."  Id. (citations

omitted).

      Arnold started the fight by walking over to Binns and punching Binns while he was not

moving.  See Video 1 at Camera 8, 18:15:34.52–18:15:39.52.  Nonetheless, Arnold alleges that

at some unspecified point when Officer Watson saw Arnold and Binns fighting, Officer Watson

"watched and then waved the fight on," Compl. Attach. at 1 ¶ 1; accord id. at 3 ¶ 5; Arnold Aff.

at 1.  Arnold construed this wave as "allow[ing] Rasheed Binns to attack [Arnold] with a weapon

in plain view. . . . [l]ooking at [Arnold] waving to continue for his own entertainment."  Compl.

Attach. at 4 ¶ 7.  In his deposition, Arnold testified that Watson waved "as if someone was down

the block, and you said to them go ahead."  Arnold Dep. 2 at 49; see also id. at 50 ("He is

pushing his hand forward away from his body, as if to say go ahead, continue.").  Arnold did not

hear Officer Watson say anything.  Id. at 53.  Ultimately, Arnold conceded that Officer Watson

reached for the telephone to call the riot squad, id. at 54–55, "within a few seconds of after he

had waved at me," id. at 56 (emphasis added); see also Arnold Aff. at 1 ("Officer Watson . . .

waved his hand forward . . . and then moments later called in the ALARM.").[5]  The ERT

responded to Watson's call immediately.  See Rule 56.1 Statement ¶¶ 17, 25, 27; Watkins Aff. ¶

2.  Moreover, the videotape of the fight shows that the inmates were looking at each other during

the entire portion of the fight that was recorded.  Video 1 at Camera 8, 18:15.38.52–18:16:54.68.

In light of the fast-moving events, the fact that Arnold never specifies at what point in the fight

the wave occurred, and the fact that there is no evidence that Binns actually saw Watson's wave,

no reasonable jury could conclude based on the evidence presented that Watson acted with

deliberate indifference to the safety of Arnold.  See Wilkerson v. Johnson, 330 F. App'x 257,

259 (2d Cir. 2009) (affirming grant of summary judgment in favor of prison officials who

responded "immediately" to defuse inmate fight).  Moreover, given that Watson quickly enlisted

the aid of a squad capable of breaking up the fight, there is no evidence that Watson's alleged

"waving" contributed to Arnold's injuries from the fight in any way.

     E.     Claims Against Other Individual Defendants

     In addition to Watson and Westchester County, Arnold names Officers Randy Watkins,

Alfred Lombardo, Michael Costello, Keith Holloway, Miguel Serrano, Robert O'Dell and

Mervin Enders as defendants in this action.  However, Arnold has not provided evidence that

any of these defendants were "personally involved [in] – that is [they] directly participated [in]"

any of the incidents discussed or that they otherwise committed a constitutional violation, a

prerequisite to § 1983 liability.  Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005).

---

[5] For his part, Officer Watson states that when he saw Arnold and Binns fighting, he ordered
them to cease and then "immediately" summoned the ERT to subdue the fight.  See Watson Aff.
¶ 6; Rule 56.1 Statement ¶ 25.

Therefore, Arnold's claims against Watkins, Lombardo, Costello, Holloway, Serrano, O'Dell, and Enders must be dismissed.  See id.

IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (Docket # 50) should be granted.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed S. Rakoff, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Rakoff.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 2, 2012
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge